## AFFIDAVIT

I, Scott A. Stranahan, a Law Enforcement Officer with the Drug Enforcement

Administration ("DEA"), being duly sworn, deposes and states:

## INTRODUCTION

1.      This affidavit is offered in support of a criminal complaint against RASHAWN D.

WATSON and an application for an arrest warrant for violating Title 21, United States Code,

Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances)

and Section 841(a)(1) (distribution and possession with intent to distribute controlled

substances).

2.      Because this affidavit is being submitted for the limited purpose of demonstrating

probable cause as to these particular criminal violations, I have not included each and every fact

known to me concerning this investigation.

## OFFICER TRAINING AND BACKGROUND

3.      Affiant has been employed as a Special Agent of the Ohio Bureau of Criminal

Investigation (BCI) since May 9, 2011. Since that time, I have been assigned to the Special

Operations Division (Narcotics).

4.      My experience as a BCI Agent includes but is not limited to: physical

surveillance, analyzing toll and text detail records, analysis of financial records, interviewing

witnesses, drafting and executing search warrants, seeking seizure of illegal drugs and other

evidence of drug violations, conducting and assisting with Title III (wiretap investigations),

supervising the purchases of controlled substances by undercover agents and confidential

informants, and debriefing persons arrested and convicted of drug trafficking offenses about their

illegal activity.   Prior to my employment with BCI, I received a Bachelor of Science Degree in

Criminal Justice and an Associate's Degree in Law Enforcement Technology from the University of Toledo. I gained law enforcement experience as a Police Officer with the Village of Put-in-Bay, Ohio, Police Department for approximately six months and as a Deputy Sheriff/Field Training Officer/Detective at the Lake County, Ohio Sheriff's Office for approximately eleven years.   I am currently assigned as a Task Force Officer to the Drug Enforcement Administration Cleveland District Office (DEA-CDO), where I have participated in investigations targeting individuals and organizations involved in drug trafficking offenses in the Northern District of Ohio and elsewhere.   At all times during the investigation described herein, I have been acting in an official capacity as a Special Agent with BCI and as a Task Force Officer with the DEA-CDO.

5.     Consequently, I am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.   I am also an investigative law enforcement officer of the United States within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am engaged in the enforcement of criminal laws and am within a category of officers authorized by the Attorney General to request and execute search warrants pursuant to 18 U.S.C. § 3061.

6.     Based upon the above experience, Affiant is familiar with the *modus operandi* of persons involved in illicit distribution of controlled substances as well as the terminology used by persons involved in the illicit distribution of controlled substances.   Affiant is aware that persons involved in the illicit distribution of controlled substances routinely attempt to conceal their identities as well as the location at which drug transactions take place.   Furthermore, Affiant is aware that persons involved in the illicit distribution of controlled substances rely on

2

their vehicles to (a) transport controlled substances to and from their customers and suppliers; (b) transport the proceeds of drug sales to and from customers and suppliers; (c) meet drug customers and suppliers in secluded, neutral, pre-arranged places to conduct drug trafficking business; and (d) store contraband and money at different locations, sometimes referred to as "stash houses."

## PROBABLE CAUSE

7.      Affiant has personally participated in the investigation set forth below.   Affiant is familiar with the facts and circumstances of the investigation through his personal participation and direct observation, and also from: (1) discussions with other agents and law enforcement officers, (2) discussions with witnesses involved in the investigation, and (3) review of records and reports relating to the investigation.   Unless otherwise noted, wherever in this Affidavit Affiant asserts that a statement was made, the information was provided by another special agent, law enforcement officer or witness who had either direct or hearsay knowledge of that statement and to whom Affiant or others have spoken, or whose reports Affiant has read and reviewed.   This Affidavit does not contain each and every piece of information known to Affiant and other investigators, but rather only information sufficient to establish probable cause to support the requested warrant.

### INITIAL INVESTIGATION

8.      In December 2017, Affiant received information from a confidential source (hereinafter referred to as CS).   The CS is aware of an individual who has been identified as RASHAWN WATSON who owns the "Savvy Smoke Shop," which is located at 10324 St. Clair Avenue, Cleveland, Ohio.   According to the CS, WATSON is involved in the illegal trafficking of heroin, marijuana and other illegal narcotics at this location.   The CS described the "Savvy Smoke Shop" as an open, retail establishment that sells tobacco and other tobacco related items.

3

9.      The CS indicated that on previous occasions, WATSON has offered to give the CS samples of suspected heroin for the CS to sell.   The CS stated that WATSON provided the samples in the hopes that the CS would begin trafficking in heroin supplied by WATSON. According to the CS, the CS has accepted a sample of heroin from WATSON.   The CS also stated that WATSON had previously provided the CS with a large number of ecstasy pills in payment of WATSON's obligation to the CS resulting from a prior drug transaction in which the CS had sold WATSON bulk quantities of marijuana.

10.     The CS stated that the CS has communicated with WATSON via cellular telephone.   The CS stated that their telephone conversations are short, as WATSON does not like to talk on the telephone.   The CS indicated that when the CS has spoken with WATSON on the telephone, WATSON will tell the CS to meet him at the store on Saint Clair Avenue, or at a prior location.   The CS recalled that the last cellular telephone number the CS had for WATSON was 216-612-9630.   Agents identified this as a T-Mobile cellular telephone with no subscriber information.

11.     The CS indicated that the CS wanted to cooperate with Law Enforcement regarding this investigation for judicial consideration in pending criminal cases.

12.     Agents then conducted a computerized criminal history (CCH) check of Rashawn WATSON which revealed numerous convictions for drug related offenses among other offenses[1].

13.     Affiant has found the CS to be a reliable source of information regarding WATSON's illicit drug activity.   The CS has provided numerous pieces of information that agents have corroborated with independent investigation.   However, during the course of this

---

1 Information concerning Rashawn WATSON's CCH will be provided in further detail later in this affidavit.

investigation, handling agents of the CS have been in contact with the CS's probation officer. Agents have been advised that the probation officer has felt that the CS has not been truthful regarding the CS's whereabouts when the CS reports he is at work.   On one such occasion, the CS had reported to probation that he would be working with the handling agents at "twelve" on a particular day.   Affiant had made plans to work with the CS that day, but then postponed those plans.   The CS then went out at about midnight, and Affiant then received a call from the probation officer at about midnight on the day for which plans had been cancelled.   The officer inquired whether the CS was working with the agents at that time, and Affiant informed the officer that the CS was not working with agents.   The probation officer later confronted the CS about his whereabouts, and the CS did not report he was working with the agents, but reported that he was at work, which the probation officer believed was not true.   The probation officer also reported that the CS submitted a urine screen that was positive for marijuana.   The CS also has a criminal record that includes convictions for possession and trafficking of controlled substances and operating a vehicle under the influence and arrests for burglary and assault.

14.    Despite the CS's criminal record and the probation officer's report, the CS has not given agents any indication that any information the CS has provided regarding WATSON was been less than truthful.   The only issue that controlling agents noted with this particular CS was more procedural in nature.   Prior to each controlled purchase the CS was instructed on agents' expectations and procedures.   The agents' expectations for the CS's activities here included that the CS would not travel from the agreed upon meeting location to another location of the target's choosing (a practice known as "tripping").   There are some instances where agents will plan for the CS to "trip," but that was not planned here.

5

15.     During the controlled purchase on February 22, 2018, discussed in greater detail below, the CS took an unexpected trip with WATSON to complete the controlled purchase. During the debriefing, the CS stated that the CS felt WATSON would have become suspicious had the CS not accompanied him to the alternate location.   Affiant found that explanation to be credible, and recognizes possible danger to the CS if WATSON had become suspicious of the CS.

<u>SURVEILLANCE OF THE SAVVY SMOKE SHOP ON JANUARY 8, 2018</u>

16.     On January 8, 2018, at approximately 3:00 p.m., Affiant and another officer conducted surveillance in the area of the Savvy Smoke Shop, located at 10324 St. Clair Avenue, Cleveland, Ohio, in a shopping plaza is known as the Glenville Plaza at the intersection of St. Clair Avenue and East 105th Street in Cleveland, Ohio.

17.     Upon arrival, officers observed that the business is located in a shopping center.  The front of the business is clearly marked with signage depicting "Savvy Smokes."  Officers also observed that the business was open and observed several customers enter and exit the business.

18.     At approximately 3:25 p.m., officers observed a white Ford F-150, bearing Ohio Temporary Registration number F286641 arrive in the area and park next to Affiant's undercover vehicle.  Officers ran the aforementioned registration and found that the vehicle is registered to RASHAWN WATSON, and has VIN# 1FTEW1E82GFC60190 (hereinafter, the "Subject Vehicle").

19.     Affiant observed a black male wearing a black ball cap, camouflage jacket, blue jeans, work boots and sun glasses, exit the front driver's side of the Subject Vehicle .  Affiant observed that the black male matched the description of WATSON.   Affiant also observed an unidentified female seated in the front passenger's seat.

6

20.     Affiant observed WATSON walk toward the Savvy Smokes shop, open the door, close the door and walk back toward the Subject Vehicle.  Affiant was able to positively identify this male as WATSON as he walked back to his vehicle.

21.     Minutes later, WATSON entered the main entrance door to the business and walk toward the back of the store and out of sight.

22.     A few minutes after that, WATSON exited the business, entered the front driver's side of the Subject Vehicle, and departed the area.

<u>SURVEILLANCE OF WATSON ON JANUARY 11, 2018</u>

23.     On January 11, 2018, detectives of the Cleveland Police Department (CPD) Gang Impact Unit conducted surveillance of the Glenville Plaza, where the Savvy Smoke Shop is located.   At approximately 11:25 p.m., CPD Detectives observed a white Ford F-150, the Subject Vehicle, arrive in the area and park in front of the Savvy Smoke Shop.   CPD Detectives observed an individual, later identified as WATSON, exit the front driver's side of the Subject Vehicle and stand next to the vehicle.   Moments later, CPD Detectives observed an unidentified male exit the front passenger's seat and walk to the driver's side of the vehicle.   CPD Detectives then observed the driver of the vehicle obtain what appeared to be a black firearm from the interior of the vehicle.   The driver then walked to the rear of the Subject Vehicle , holding the firearm in his right hand.   CPD Detectives observed that the driver held the firearm in a low ready position and scanned the parking lot.

24.     CPD Detectives observed a third male exit the Subject Vehicle and remove two black duffle bags from the interior of the vehicle.   CPD Detectives observed that the duffle bags appeared to be full.   CPD Detectives observed the third male carry the duffle bags into the front door of the Savvy Smoke Shop, followed by the driver.   CPD Detectives observed that the front passenger remained outside of the Subject Vehicle standing in the parking lot.

7

25.     Approximately 10 minutes later, CPD Detectives observed the driver and the third male emerge from the Savvy Smoke Shop and walk toward the Subject Vehicle.   CPD Detectives observed that neither individuals were carrying any duffle bags and the firearm was no longer visible.   After locking the security gate on the front of the store, two males entered the Subject Vehicle and departed the area.   The original driver of the vehicle walked around the plaza and met with the Subject Vehicle, which was now parked at the rear door of the Savvy Smoke Shop.   CPD Detectives then observed the three males and two females enter the rear door of the Savvy Smoke Shop.

26.     Approximately 1 hour later, the three males and two females exit the store and entered the Subject Vehicle and departed the area.   Surveillance observed the Subject Vehicle arrive at the Doubletree Hotel located at 1111 Lakeside Avenue, Cleveland, Ohio.   The Subject Vehicle entered the parking garage and remained running once it parked.   Approximately 5 minutes later, the Subject Vehicle departed the parking garage.   Surveillance found that the Subject Vehicle arrived at the Butternut Ridge Apartment complex located at 5800 Great Northern Boulevard, North Olmsted, Ohio.   CPD Detectives located the Subject Vehicle parked in the parking lot and unoccupied.   CPD Detectives were unable to determine which apartment WATSON and the other individuals entered, and surveillance was terminated.

<u>MEETING BETWEEN CS AND WATSON ON JANUARY 17, 2018</u>

27.     In an effort to re-establish contact between WATSON and the CS, investigators planned an operation that would send the CS into WATSON's store (Savvy Smoke Shop) to engage in conversation regarding future drug transactions.   This meeting was scheduled to occur on January 17, 2018.   The CS was not supplied with an Official Authorized Funds as this was not planned as a controlled purchase.   The CS was supplied with recording/transmitting devices to capture and record any conversations with WATSON.   The CS was also searched for

contraband before and after the meeting with WATSON, and none was found at either time. Agents also established surveillance in the area of the Savvy Smoke Shop prior to the CS's arrival.

28.     On January 17, 2018, in the early afternoon, agents observed the Subject Vehicle pull into the plaza parking lot and stop directly in front of the Savvy Smoke Shop. WATSON exited the driver side of the Subject Vehicle wearing a black baseball cap, light gray hoodie sweatshirt, red winter vest, and dark gray sweatpants. WATSON approached the front of the Savvy Smoke Shop and unlocked the retractable security gate that was down in the locked position. WATSON unlocked the security gate and raised the gate, revealing the front entrance to the shop. WATSON then returned to the Subject Vehicle, and proceeded to park in a designated parking space adjacent to the front of the shop. WATSON then exited the Subject Vehicle, and proceeded toward the front entrance to the shop. WATSON unlocked the front door and entered the shop.

29.     Approximately 10 minutes later, the surveillance team observed the CS enter the Savvy Smoke Shop through the main entrance.   Moments later, the CS met with WATSON and engaged in a brief conversation.

30.     During the meeting, agents monitored the live conversation between WATSON and the CS via the recording/transmitting device.   WATSON told the CS that he (WATSON) had a "little bit left," meaning he (WATSON) had a small amount of heroin available for sale. The CS can be overheard referencing a prior time WATSON provided the CS heroin, but WATSON stated he had some "different shit," meaning a different type of heroin.   The CS then told WATSON a concern that other sources have been selling heroin with fentanyl. The CS then reiterated to WATSON that the CS did not want to purchase any heroin containing

9

fentanyl.   WATSON also offered to sell the CS pounds of marijuana for $1,800 to $2,000 per pound.

31.     At the very end of the conversation, WATSON provided the CS with his cellular telephone number, 216-219-6412.   Affiant identified this telephone number as a Verizon Wireless Cellular telephone, and learned from Verizon that it is subscribed in the name of a female, A. Watson, who reported her billing address as 16306 Arcade Avenue, Cleveland, Ohio,[2] and has been an active telephone number since August 11, 2016.   (Unless otherwise noted, the CS used the 216-219-6412 number for all subsequent attempts to contact WATSON by telephone call or text message and for receipt of calls or messages from WATSON.)

32.     The CS exited the Savvy Smoke shop approximately two minutes after the CS entered the Savvy Smoke shop, departed the area and met with investigators at a pre-determined meeting location.   The CS was again searched for contraband and none was found.

<u>INSTALLATION OF GPS TRACKING DEVICE ON THE SUBJECT VEHICLE ON JANUARY 22, 2018</u>

33.     CPD Detectives obtained a court order authorizing the installation of a GPS tracking device on WATSON's white Ford F-150.

34.     On January 22, 2018, officers established surveillance at several areas in northeast Ohio suspected to be utilized/frequented by Rashawn WATSON to locate WATSON's vehicle, a 2016 white Ford Pick-up Truck bearing Ohio license plate HIA5288, which is the same white Ford F-150 pickup truck that officers had previously observed bearing Ohio registration *temporary* tag of F286641, both associated with VIN# 1FTEW1E82GFC60190 (the "Subject Vehicle").   Officers intended to install a court-authorized GPS tracking device.

---

2  This is the same address that Rashawn WATSON reported to the Ohio Bureau of Motor Vehicles on his Ohio Driver's License as well as his vehicle registration for the 2016 white Ford F-150.

35.     At approximately 9:00 p.m., Affiant observed the Subject Vehicle parked in the rear parking lot area of the Butternut Ridge Apartment, located at 5620 Great Northern Boulevard, North Olmstead, Ohio.   Officers then maintained surveillance of the Subject Vehicle for about 45 minutes.

<u>CONTROLLED PURCHASE FROM WATSON ON JANUARY 23, 2018</u>

36.     On January 23, 2018, agents participating in this investigation established surveillance in the area of the Savvy Smoke Shop in anticipation of the CS purchasing heroin from WATSON.

37.     Shortly before noon, agents observed the Subject Vehicle arrive in the area and park in the parking area near the Savvy Smoke Shop.   Agents observed WATSON exit the vehicle, unlock the door and enter the store.

38.     Controlling agents then met with the CS at an undisclosed location.   At Affiant's direction, the CS sent a text message to WATSON's cellular telephone number, 216-219-6412, to see if WATSON was at the store.   Agents then searched the CS for contraband and none was found.   Agents also equipped the CS with a recording/transmitting device as well as $1,100.00 in pre-recorded Ohio BCI Official Authorized Funds (OAF).

39.     At approximately 1:00 p.m., WATSON sent a text message indicating WATSON was at the store.   The CS then sent WATSON a text message indicated the CS would be arriving soon.   WATSON replied via text message, indicating he would also be at the store soon.

40.     A short time later, officers dropped the CS off in the area of the Savvy Smoke Shop.   Investigators maintained surveillance as the CS walked to the Savvy Smoke Shop.

41.     At approximately 1:10 p.m., agents observed the CS walk up to the door of the Savvy Smokes Shop, knock on the door and go inside.   Once inside, agents were able to hear the CS engaged in conversation with WATSON via the recording/transmitting device.

11

42.     During the conversation, the CS requested to purchase 14 grams of heroin from WATSON.   The CS stated that WATSON briefly went into a back room, through a door that is located behind the counter, and then reappeared. The CS stated that when WATSON reappeared, he asked the CS if he had more money and wanted to do "19" instead. WATSON then told the CS if the CS took the "19," WATSON would be out of product and would have to go get some more. The CS then handed WATSON $1,020.00 in pre-recorded Ohio BCI OAF.   WATSON accepted the funds and handed the CS a package containing approximately 19 grams of suspected heroin (hereinafter, "Substance 1").   The CS then departed the store and met with investigators at an undisclosed location.

43.     During the meeting, the CS handed investigators Substance 1.   Agents inspected the package and found Substance 1 to consist of a chunky, purple substance wrapped in clear plastic.   Custody of Substance 1 was then transferred to the CPD Gang Unit, who later forwarded Substance 1 to the laboratory for analysis.   According to the lab report from the Cuyahoga County Regional Forensic Science Laboratory, Substance 1 contained 17.43 grams of a substance containing Fentanyl, a Schedule II controlled substance.

44.     Agents then searched the CS for contraband with negative results.

45.     While agents were debriefing the CS, other agents maintained surveillance of the Savvy Smoke Shop.

46.     At approximately 1:20 p.m., agents observed WATSON exit the Savvy Smoke Shop, enter the front driver's side of his white Ford F-150, the Subject Vehicle,and depart the area.

12

47.     Surveillance showed that WATSON arrived at a residence in Euclid, Ohio. Officers observed WATSON exit the Subject Vehicle and enter the residence.   A short time later, WATSON exited the residence, entered his vehicle and departed the area.

48.     At approximately 1:40 p.m. agents observed WATSON park in front of a business located at 15615 Waterloo Rd Cleveland, Ohio, and leave his truck running and enter the business. Agents observed WATSON return to the Subject Vehicle approximately 9 minutes later carrying a box and enter the vehicle.

49.     At approximately 2:20 p.m., officers observed WATSON arrive at 617 East 101st Street, Cleveland, Ohio (hereinafter, the "Stash House") and a black male wearing a black vest enter the passenger seat of WATSON's vehicle.    (According to the Cuyahoga County Auditor's Website, the listed owner of the Stash House is RASHAWN D. WATSON.)   Officers then observed WATSON depart the location.

50.     At approximately 2:25 p.m., officers observed WATSON return to the Savvy Smoke Shop, park his vehicle and both WATSON and the black male passenger entered into the smoke shop. Throughout surveillance, investigators observed WATSON conduct what appeared to be counter surveillance maneuvers, such as driving around the block and doubling back ways he'd already driven.

<u>SURVEILLANCE OF WATSON ON FEBRUARY 5, 2018</u>

51.     On Monday, February 5, 2018, at approximately 9:00 a.m. Affiant checked the court authorized GPS tracking device installed on the Subject Vehicle.   Investigation revealed that WATSON was at his apartment located at 5620 Great Northern Boulevard, North Olmsted, Ohio.

52.     At approximately 10:10 a.m., agents located the Subject Vehicle, confirmed by license plate number, parked in the parking lot of the La Quinta hotel located at 25105 Country Club Boulevard, North Olmsted, Ohio.   Agents then established surveillance in the area.

53.     At approximately 12:20 p.m., agents observed a black male and a black female exit the hotel carrying several luggage bags.   A short time later, agents observed both individual enter the Subject Vehicle and depart the area.   Agents maintained surveillance as the vehicle departed the area.

54.     At approximately 12:45 p.m., the Subject Vehicle stopped at an unknown residence located in the area of East 140th Street and McElhattan Avenue, in Cleveland, Ohio.  Agents were unable to verify the address WATSON actually stopped at.   A short time later, Agents located the Subject Vehicle as it traveled south on East 140th Street.

55.     At approximately 12:50 p.m., WATSON arrived in the Subject Vehicle at the Savvy Smoke Shop.   Affiant observed WATSON exit the Subject Vehicle, and remove an item from the rear passenger's side of the truck.   Affiant's vehicle was blocked by other vehicles in the parking lot.   Moments later, Affiant observed WATSON walking through the parking lot toward the store carrying a black leather bag in his right hand.

56.     At approximately 12:55 p.m., WATSON entered the Savvy Smoke shop through the front entrance door.

CONTROLLED PURCHASE FROM WATSON ON FEBRUARY 8, 2018

57.     On February 8, 2018, at approximately 10:00 a.m., Drug Enforcement Administration (DEA) Cleveland District Office (CDO) Task Force Group 1 met at the DEA-CDO for the purpose of conducting an operational briefing in preparation for the anticipated CS controlled purchase of approximately 16 grams of heroin from Rashawn WATSON.

14

58.     On February 8, 2018, at approximately 10:45 a.m., in anticipation of the CS making controlled purchase of approximately 16 grams of heroin from WATSON, officers established surveillance in the area of WATSON's apartment at 5620 Great Northern Boulevard, North Olmsted, Ohio, 44070, Apartment  H2 (hereinafter, the "Apartment Residence").

59.     At approximately 10:55 a.m., officers observed WATSON exit his apartment, identified on the door as unit H2, carrying a duffle bag. As WATSON exited the apartment, a residential alarm system was heard being activated prior to exiting the apartment door identified as "H2".   Officers followed WATSON as he exited the front door of the apartment building.   WATSON was wearing a tan trench coat, brown boots and carrying a duffel bag in his right hand.   Officers observed WATSON enter the front driver's side of the Subject Vehicle and depart the area.   Officers attempted to maintain surveillance, but due to traffic concerns in the area as well as a malfunctioning GPS tracker device, surveillance was lost. In an effort to locate WATSON, officers established surveillance at various locations WATSON has been known to frequent.

60.      Shortly after noon, officers observed the Subject Vehicle pull into the parking lot of the Savvy Smoke Shop and park in the parking lot.   Officers observed WATSON as he exited the driver's seat and approached the front passenger door.   WATSON opened the door and removed the same duffle bag from the vehicle that was observed being carried from WATSON's apartment.  Officers then observed WATSON exit his vehicle and enter the store's front door carrying the same duffle bag.

61.     At approximately 12:30 p.m., agents met with the CS at an undisclosed location. The CS was searched for contraband with negative results.   The CS was equipped with a

recording/transmitting device as well as $1,100.00 in prerecorded Ohio BCI Official Authorized Funds.

62.      A short time later, the CS sent a text message to WATSON, asking if WATSON was at the shop.   WATSON did not respond to this message.

63.      Shortly after 1:00 p.m., the CS arrived at the front entrance to the Savvy Smoke Shop.   Via the audio recording/transmitting device(s), agents could hear the CS ring a door bell. A few seconds later, the surveillance team observed the CS enter the front door of the Savvy Smoke shop.   (Affiant is aware from other surveillance of the Savvy Smoke Shop that customers often have to ring a doorbell in order to be granted access.)

64.      While the CS was inside the store, agents were able to monitor the CS and WATSON engaged in conversation via the audio recording/transmitting device(s). During the conversation, the CS asked to purchase approximately 14 grams of heroin. WATSON told the CS to come back in 5 minutes, as WATSON had to go to a different location to obtain the heroin. The CS then concluded the conversation and exited the Savvy Smoke Shop.

65.      The CS exited the store a couple minutes after entering, and returned to meet with controlling agents.

66.      Approximately one minute after the CS exited, officers observed WATSON exit the Savvy Smoke Shop and enter the driver's seat of the Subject Vehicle, move the vehicle to directly in front of the Savvy Smoke Shop, and re-entered the store.

67.      A few minutes later, officers observed WATSON exit the store, enter the subject vehicle, and depart the area.   Surveillance observed that WATSON drove directly to the Stash House (617 East 101st Street, Cleveland, Ohio).

68.     Officers observed WATSON exit his vehicle and walk to the front door of the Stash House.   Officers observed WATSON use what appeared to be a key to open the front door of the Stash House.   Surveillance observed that WATSON left the Subject Vehicle running while he went inside the residence.

69.     Officers then observed WATSON exit the Stash House carrying a white bag, walk to the Subject Vehicle, and place the bag behind the driver's seat. Moments later, WATSON entered the Subject Vehicle and drove it away from the Stash House.   The surveillance team observed WATSON drive directly to the Savvy Smoke Shop parking lot.

70.     Officers then observed WATSON exit his vehicle and enter the front door of the Savvy Smoke Shop.

71.     A few minutes later, Affiant saw the CS receive a telephone call from WATSON's cellular telephone (216-219-6412).   During the conversation, WATSON told the CS that he returned to the Savvy Smoke Shop.   The CS then walked back toward the Savvy Smoke Shop.

72.     At approximately 1:30 p.m., officers observed the CS arrive at the Savvy Smoke shop and could overhear the doorbell via the audio recording/transmitting device(s). Approximately one minute later, the CS entered the Savvy Smoke Shop through the front door.

73.     Soon after entering, the CS engaged in a brief conversation with WATSON. During the conversation, WATSON told the CS to give him $1,100.00 and WATSON would give the CS a larger quantity of heroin. The CS then handed WATSON $1,100.00 of prerecorded Ohio BCI OFA. Agents were able to hear WATSON counting the confidential funds via the audio recording/transmitting device(s). WATSON accepted the confidential fund and handed the

17

CS a package of suspected heroin (hereinafter, "Substance 2"). The CS secured Substance 2 and briefly continued to speak to WATSON before departing the store.

74.     The CS then met with investigators at a pre-determined meeting location.   The CS relinquished custody of Substance 2 to officers.   Officers inspected Substance 2 and found it contained a chunky purple substance wrapped in clear plastic.   Substance 2 was submitted for testing, and the lab test revealed that it consisted of 16.02 grams of a mixture or substance containing Fentanyl, a Schedule II controlled substance.

<u>CONTROLLED PURCHASE FROM WATSON ON FEBRUARY 22, 2018</u>

75.     In anticipation of an another controlled purchase from WATSON, on February 22, 2018, agents established surveillance inside of WATSON's apartment complex at 5620 Great Northern Boulevard, North Olmsted, Ohio.   Agents also established surveillance in the area of the Savvy Smoke Shop as well as the Stash House.

76.     At approximately 10:30 a.m., officers observed WATSON exit the apartment carrying clear plastic bags.   Agents observed WATSON place the bags inside the Subject Vehicle and depart the area.

77.     Shortly before 1:00 p.m., agents observed WATSON arrive at the Savvy Smoke Shop and park against the curb in front of store.   Agents observed WATSON remove clear plastic bags from his truck and carry them into the store.

78.     Agents then met with the CS at an undisclosed location for an operational briefing.   The CS was searched for contraband and none was found.   Agents equipped the CS with recording/transmitting devices that were tested and found to in good working order. Agents also supplied the CS with $1,200.00 of pre-recorded Drug Enforcement Administration Officially Authorized Funds (DEA-OAF) to facilitate this transaction.   The CS was then

dropped off in the area of the Savvy Smoke Shop.   Agents maintained visual surveillance as the CS walked the remaining distance to the Savvy Smoke Shop.

79.     A short time later, the CS entered the Savvy Smoke Shop and engaged in a brief conversation with WATSON.   WATSON told the CS that he would not have any heroin available for sale for at least one hour.   WATSON then directed the CS to return in one hour.   The CS then departed the Savvy Smoke Shop and met with agents.   Agents searched the CS for contraband with negative results.   Agents recovered the DEA OAF for safekeeping as well as removed the recording/transmitting equipment.

80.     Shortly after 2:30 p.m., the CS called WATSON.   During the call, WATSON told the CS that he would call the CS back in 20 minutes.   Approximately 25 minutes later, the CS attempted to place a recorded call to WATSON, but WATSON did not answer.

81.     Agents then searched the CS for contraband with negative results.   Agents equipped the CS with recording/transmitting devices and supplied the CS with $1,200.00 of pre-recorded DEA-OAF.   Agents then dropped the CS off a short distance away from the Savvy Smoke Shop.   Agents maintained surveillance as the CS walked the remaining distance.

82.     A short time later, the CS entered the store and engaged in conversation with WATSON.   WATSON again told the CS that he did not yet have the heroin.   The CS then exited the Savvy Smoke Shop and returned to agents.   Agents searched the CS for contraband with negative results.   Agents recovered the recording/transmitting equipment as well as the DEA-OAF.

83.     Approximately 20 minutes later, the CS received an incoming telephone call from WATSON.   During the telephone call, WATSON told the CS that the heroin would be arriving at

the Savvy Smoke Shop.   The CS ended the call and sent a text message to WATSON, saying that the CS would be returning to the Savvy Smoke Shop.

84.     Agents then searched the CS for contraband and none was found.   Agents equipped the CS with recording/transmitting devices and supplied the CS with $1,200.00 of pre-recorded DEA-OAF.   The CS was then dropped off a short distance away from the Savvy Smoke Shop.   Agents maintained surveillance as the CS walked the remaining distance.

85.     The CS entered the store and engaged in conversation with WATSON.   During the conversation, WATSON updated the CS as to the status of his source of supply's arrival. The CS then communicated this information to your affiant.

86.     At approximately 4:30 p.m., agents observed WATSON and the CS exit the Savvy Smoke Shop.   Moments later, agents observed WATSON enter the front driver's seat of the Subject Vehicle and the CS enter the front passenger's seat.   Agents then observed the Subject Vehicle depart the area.   Agents attempted to maintain visual surveillance of the vehicle, however due to traffic volume and a malfunctioning GPS tracking device, visual surveillance was lost.   Agents were still able to hear WATSON and the CS engaged in conversation via the recording/transmitting device.   Agents were able to determine that WATSON drove the CS to a separate location where he obtained the suspected heroin.   WATSON returned to the Subject Vehicle and handed the suspected heroin to the CS.   The CS then handed WATSON $1,200.00 of DEA-OAF.   WATSON told the CS that they would weigh the heroin when they returned to the Savvy Smoke Shop.

87.     Approximately 10 minutes after surveillance was lost, Agents observed the Subject Vehicle arrive in the area and park in the parking lot of the Savvy Smoke Shop.   Agents observed WATSON and the CS enter the store.   A short time later, agents observed the CS exit

the store.   The CS then returned to agents and relinquished custody of approximately 16 grams of suspected heroin (hereinafter, "Substance 3").   Agents then conducted a debriefing where the CS provided the following details:

a.      Upon entering the Savvy Smoke Shop for the third time, WATSON told the CS several times that his source of supply would be arriving soon.   WATSON grew tired of waiting and asked the CS to accompany him to his vehicle.   Although the CS was previously instructed by handling agents that the CS was not to travel to any additional locations with WATSON, the CS made the decision to go with WATSON.   The CS felt that if they did not accompany WATSON, WATSON would become suspicious.

b.      Upon entering WATSON's vehicle, WATSON drove to a gym located at 15430 Waterloo Road, Cleveland, Ohio.   WATSON parked his vehicle at the Sunoco Gas Station next to the gym and entered the front driver's side of a white van, which was parked in the street in front of the gym.   The CS observed WATSON exit the van and return to the truck.

c.      Upon entering his truck, WATSON handed the CS a package of suspected heroin. The CS then handed WATSON $1,200.00 of DEA-OAF.   WATSON told the CS that the package looked like it contained more heroin than what the CS asked for.   WATSON indicated that they would weigh the suspected heroin once they returned to the Savvy Smoke Shop.   The CS stated that they drove directly to the Savvy Smoke Shop without making any stops in between.

d.      Once they arrived at the Savvy Smoke Shop, WATSON and the CS entered the store.   The CS handed WATSON the package of suspected heroin.   WATSON then

21

walked behind the counter and through a door into the rear of the business out of the public eye.   The CS remained inside the public portion of the store.

    e.    WATSON returned a short time later and handed the CS another package of suspected heroin.   The CS noticed that this package appeared to contain a smaller quantity of suspected heroin.   The CS secured the package and spoke briefly with WATSON before departing the Savvy Smoke Shop.

88.    Officers weighed the suspected heroin the CS purchased from WATSON, Substance 3, and observed it contained an unofficial weight of 16 grams.   Substance 3 did not have the same chunky texture and purple hue of Substance 1 and Substance 2.   Based on my training and experience, Substance 3 appears to be heroin or a mix of heroin and fentanyl, however agents are still awaiting the official results of laboratory testing.   Officers submitted Substance 3 as evidence at CPD, who later forwarded the evidence to the Cuyahoga County Regional Forensic Science Laboratory.

<u>WATSON'S CRIMINAL HISTORY</u>

89.    Affiant conducted a review of WATSON's criminal history via law enforcement databases and court records, which indicate that WATSON's convictions in the Cuyahoga County Common Pleas Court alone include the following crimes:

    a.    Improperly Handling Firearms In A Motor Vehicle (F4) with a 1-year Firearm Specification (2010);

    b.    Drug Trafficking (F3) (2009);

    c.    Drug Trafficking (F4) with a schoolyard specification and a juvenile specification (2009);

    d.    Failure To Comply With Order or Signal of Police Officer (F3) (2007);

e.      Aggravated Robbery (F1), Drug Trafficking (F5) with 1-year Firearm

Specification, Resisting Arrest (F4), Carrying Concealed Weapon (F4), Retaliation (F3),

Intimidation (F3), Having a Weapon Under Disability (F5) and other charges (2003);

f.      Preparation of Drugs for Sale (F5) (1999); and

g.      Possession of Drugs (F5) (1998).

<u>INTELLIGENCE INFORMATION CONCERNING CONTENTS OF THE APARTMENT
RESIDENCE</u>

90.      Agents interviewed a person who performed maintenance inside WATSON's

Apartment Residence within the last month (the "Maintenance Worker").   The Maintenance

Worker reported the following:

a.      The Maintenance Worker was assigned to perform maintenance at the Apartment

Residence.

b.      The Maintenance Worker knocked on the door and heard an individual come

down the stairs inside the apartment.

c.      The Maintenance Worker could hear something being removed from the door on

the inside of the apartment.  Moments later, a light-skinned black male opened the

door.  The Maintenance Worker identified himself, and the male closed the door.

d.      The Maintenance Worker remained in the hallway and was able to hear the

individual go up the stairs and then return moments later.

e.      Upon entering the apartment, the Maintenance Worker observed a device used to

secure an entry door by connecting it to the door knob inside the apartment.  Such a

device is highly unusual in this area.

f.      The male escorted the Maintenance Worker to a room inside the apartment where

the water heater is located.  The Maintenance Worker changed a light bulb in this room.

g.      The Maintenance Worker recalled seeing what appeared to be a chest freezer inside this room.

h.      The male followed the Maintenance Worker through the apartment as he performed the maintenance tasks.

i.      At one point the Maintenance Worker observed WATSON talking on a cellular telephone.  The Maintenance Worker described the conversation as being drug-related in his opinion.  The Maintenance Worker overheard the male at some point say into the phone, "Just give me 150 so I can make 10 on it."  The Maintenance Worker could not recall any other portion of the call and surmised that it was drug related based on what he heard.

91.     Agents showed the Maintenance Worker a photo line-up containing six photographs, including WATSON's.  The Maintenance Worker viewed the line-up and without hesitation or prompting pointed to the middle photograph in the first row of photos, which was WATSON.  The Maintenance Worker stated that he was 85% certain that the individual depicted in that photograph is the unidentified black male he observed inside the Apartment Residence.

92.     Based on Affiant's training and experience, Affiant is aware that professional drug traffickers often use refrigerators and freezers to store illegal narcotics.   In Affiant's experience, drug traffickers use these items not only to conceal the illegal narcotics, but to also preserve their freshness.   Affiant is aware that marijuana packaged in plastic packaging material will become rotten and useless if it is not preserved in a freezer.

INFORMATION REGARDING THE STASH HOUSE AND THE APARTMENT RESIDENCE

93.     Agents have learned from the Butternut Ridge Apartment Complex at 5770 Great Northern Boulevard, North Olmstead, Ohio, the following:

a.      Their records indicate that another unit in the Butternut Ridge Apartment Complex—Apartment F3—was a previous address associated to WATSON and a female name (hereinafter, "C.H.").

b.      According to management, records indicated the initial date of contract for the Apartment Residence, Apartment H2, was July 14, 2017.   It was leased in the name of an S. WATSON.

c.      C.H. was the only listed occupant of Apartment H2, with a listed telephone number ending in 7805.   (Affiant also discovered the same 7805 number during initial analysis of telephone toll records for WATSON's cellular phone, 216-219-6412.   In addition, the 7805 number is subscribed in the name of C.H. and subscriber information lists the address of the Apartment Residence: 5620 Great Northern Boulevard, Apartment H2, North Olmstead, Ohio.)

d.      The emergency contact for Apartment H2 is RASHAWN WATSON, Phone Number 216-562-7682; Email Savvyshop216@gmail.com

94.      According to First Energy Corporation records, the electrical service for the Apartment Residence (Apartment H2) is listed in the name RASHAWN D. WATSON.   The service has been active since August 1, 2017.

95.      According to the City of Cleveland Water Department, RASHAWN WATSON is the responsible party for property located at 617 East 101st Street, Cleveland, Ohio, the Stash House.  Billing records show that the current account balance is $1,718.21.

PATTERN OF MOVEMENT BETWEEN THE APARTMENT RESIDENCE, THE STASH HOUSE, AND THE SAVVY SMOKE SHOP

96.      Agents reviewed data collected from the court authorized GPS tracking device installed on the Subject Vehicle and observed a pattern of activity where WATSON travels from

his Apartment Residence in North Olmsted and then between his the Stash House on 101st Street in Cleveland and the nearby Savvy Smoke Shop.

97.    For example, GPS tracker data revealed the following information on January 31, 2018:   WATSON traveled to several locations prior to arriving at the Savvy Smoke Shop at approximately 8:56 p.m.   At approximately 8:59 p.m., WATSON departed the Savvy Smoke Shop and arrived at the Stash House.   From there, WATSON stopped at convenience store and went for a short drive before returning to the Savvy Smoke Shop at approximately 9:32 p.m.   At 10:33 p.m., WATSON departed the Savvy Smoke Shop and arrived at the Stash House. WATSON departed this location and stopped briefly at a gas station before returning to the Savvy Smoke Shop.   In the following hours, WATSON repeated this pattern of stopping at the Stash House, then traveling to several other residences before returning to the Stash House and then the Savvy Smoke Shop.   On February 1, 2018, at approximately 2:27 a.m., WATSON arrived at the Apartment Residence.

98.    As another example, Agents reviewed GPS tracking data for WATSON's vehicle collected on February 15, 2018, which revealed the following information:   At approximately 9:11 a.m., WATSON departed the Apartment Residence and made several brief stops at retail establishments prior to arriving at the Savvy Smoke Shop at 10:31 a.m.   At approximately 12:01 p.m., WATSON departed the Savvy Smoke Shop and arrived at the Stash House.   At approximately 12:13 p.m., WATSON departed the Stash House, drove for approximately 2 minutes and 54 seconds before returning to the Stash House at approximately 12:16 p.m.   At approximately 12:20 p.m. WATSON returned to the Savvy Smoke Shop.   Between 12:21 p.m. and 1:12 p.m. WATSON repeated this same pattern of traveling between the Savvy Smoke Shop

and the Stash House.   At approximately 11:54 p.m., WATSON departed the Savvy Smoke Shop and drove to a residence in Livonia, Michigan (a suburb of Detroit).

99.     Although Agents were not actively conducting surveillance of WATSON during the times listed in the previous two paragraphs and at other times where this pattern of movement was observed, Affiant is aware that individuals involved in drug trafficking will often travel in certain patterns.   It is affiant's experience that often times drug traffickers will maintain a primary residence and also a "stash location," in this instance, the Apartment Residence and the Stash House, respectively.   It is my experience that drug traffickers keep proceeds earned through drug trafficking, firearms, drug ledgers and small amounts of illegal drugs at their primary residence.   It is my experience that drug traffickers will store the larger quantities of illegal drugs at their stash locations and go to these locations to obtain drugs that they can then distribute.   It is my experience that often times, drug traffickers will only carry small amounts of illegal drugs on their persons or in their vehicles, enough to complete their pre-arranged transactions, and then return to their stash location to obtain additional quantities of illegal drugs. It is also my experience that drug traffickers will often meet their clients at open, public businesses such as gas stations and retail establishments.

100.     Affiant believes that this activity is indicative of drug trafficking activity at the Apartment Residence, the Savvy Smoke Shop, and the Stash House.   Affiant is aware that the Savvy Smoke Shop is an open retail establishment.   Affiant is also aware that WATSON traffics in drugs at this location as well.   As evidenced during the second controlled purchase, WATSON was at the Savvy Smoke Shop when the CS arrived to purchase heroin.   WATSON left the Savvy Smoke Shop, drove to the Stash House and returned a short time later to complete the transaction with the CS.   It is affiant's belief and experience that the Savvy Smoke Shop

provides a unique opportunity for WATSON to appear to be engaged in a legitimate retail business while continuing his involvement in drug trafficking.

## **CONCLUSION**

101.     Based on the preceding, and my training and experience, I believe there is probable cause to believe that between on or about January 17, 2018 and on or about February 22, 2018, in the Northern District of Ohio, Eastern Division, RASHAWN D. WATSON knowingly and intentionally combined, conspired, confederated and agreed with other persons not charged herein, to commit the following offense: to distribute and possess with intent to distribute a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, and a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), all in violation of 21 U.S.C. § 846.

102.     Further, based on the preceding, and my training and experience, I believe there is probable cause to believe that between on or about January 17, 2018 and on or about February 22, 2018, in the Northern District of Ohio, Eastern Division, RASHAWN D. WATSON did knowingly and intentionally distribute and possess with intent to distribute a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, and a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

103.     Based on the foregoing, Affiant believes there is probable cause in support of a criminal complaint and the issuance of an arrest warrant for WATSON.

104.    I, TFO Scott A. Stranahan, U.S. Drug Enforcement Administration, being duly sworn according to law, deposes, and states that the facts stated in the foregoing Affidavit are true and correct to the best of my knowledge, information, and belief.

TFO Scott A. Stranahan
Drug Enforcement Administration
Cleveland District Office

Sworn to before me and subscribed in my presence
this 1st day of March, 2018.

Thomas M. Parker
United States Magistrate Judge